[Cite as *Muldowney v. Portage Cty., Ohio Board of Cty. Commissioners*, 2018-Ohio-2579.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| MICHAEL J. MULDOWNEY, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2017-P-0072** |
| PORTAGE COUNTY, OHIO BOARD OF COUNTY COMMISSIONERS, et al. | : | |
| Defendants-Appellees. | : | |
| | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2015 CV 00770.

Judgment: Affirmed.

*John F. Myers,* 275 North Portage Path, #3C, Akron, OH 44303 (For Plaintiff-Appellant).

*Todd M. Raskin, Frank H. Scialdone,* and *David M. Smith,* Mazanec, Raskin & Ryder Co., L.P.A., 100 Franklin's Row, 34305 Solon Road, Cleveland, OH 44139 (For Defendants-Appellees).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Michael J. Muldowney, appeals from the order of the Portage County Court of Common Pleas granting appellees, Portage County, Ohio Board of County Commissioners, et al., summary judgment. At issue is whether appellant's statutory claims for disability discrimination and retaliatory discharge are barred by operation of the doctrine of collateral estoppel because appellant previously went

through the grievance process, per the parties collective bargaining agreement ("CBA") and the arbitrator found appellant was terminated for just cause. If the causes of action are not so barred, we must determine whether there are genuine issues of material fact that remain for litigation. We answer the first issue in the negative, but conclude summary judgment was nevertheless appropriate. We therefore affirm.

{¶2} Appellant commenced employment with the Portage County Sheriff's Department in September 2000. In 2009, appellant generally worked first-shift courthouse security. He was assigned to third shift, however, for road-patrol training, pursuant to a policy implemented by Sheriff David Doak requiring all deputies to be road-certified. Appellant spoke with certain superiors, advising them that he suffered from sleep apnea and working third shift may be difficult for him due to the medical condition. Regardless, appellant commenced training on third shift.

{¶3} Appellant exhibited multiple deficiencies during his road training. Appellant's field-training officer noted various problems in appellant's driving in his daily observation reports. In particular, appellant lacked familiarity with county roads and landmarks; possessed poor map-reading skills; he was unable to determine the shortest route possible between two points; he lacked knowledge of county geographical lines; he failed to notice street signs indicating county lines; he had a poor sense of direction; he would fail to stop before turning right on red; he turned right on red where a sign was posted "no turn on red," and he had difficulty "multi-tasking."

{¶4} On January 12, 2010, appellant's treating physician, Dr. Stephen Crowe, prepared a letter "[t]o whom it may concern," in which he opined appellant had "obstructive sleep apnea." The letter further advised that, "[d]ue to compliance and

2

treatment, it may be best if [appellant] work first or second shift * * *." Although Sheriff Doak did not specifically recall receiving the letter, he stated he would have been hesitant to afford appellant a shift change or granting appellant "light duty." He maintained deputies were required to bid for a shift change and the sheriff had instituted a policy whereby light duty was not an option; in his estimation, one was either fit for duty or not. On January 26, 2010, Dr. Crowe sent a second letter, this time directly to Sheriff Doak, stating appellant had been diagnosed with obstructive sleep apnea and shift work disorder. The doctor apologized for the "nature" of the previous letter and noted he was taking steps to resolve the problems with "CPAP and medications." The doctor advised the sheriff he was aware that "shifts are required for his positions" and he expected "significant improvements over the next few weeks."

{¶5} On February 2, 2010, Sheriff Doak sent a letter to Dr. Joel Steinberg, advising the doctor that an appointment had been made for appellant to undergo an independent medical examination. The sheriff noted his belief that the examination was necessary due to appellant's recent behavior. The sheriff stated, "[n]ot only has [appellant] been insubordinate, but his erratic behavior has supervisors concerned for his welfare along with his fellow employees."[1]

{¶6} On February 22, 2010, after receiving Dr. Steinberg's evaluation, Sheriff Doak made an appointment with Dr. Roger Weiss to schedule a neurological examination for appellant. The sheriff noted that, in the course of evaluating appellant's fitness for duty, Dr. Steinberg recommended appellant see a neurologist due to concerns that he might be developing dementia.

---

1. Appellant had been suspended on two previous occasions for insubordination and failure to respect supervisors.

{¶7} On March 1, 2010, Dr. Weiss provided the Sheriff with progress notes and, on April 20, 2010, Dr. Weiss provided a fitness-for-duty report indicating appellant was fit for duty, but restricted from working third shift. Sheriff Doak subsequently instructed appellant to work the "power shift," from 8:00 p.m. to 4:00 a.m. (third shift is from 12:00 a.m. to 8:00 a.m.) Appellant spoke with the sheriff's administrative assistant, Linda Mottern, and explained he could not work nights, per Dr. Weiss' recommendation. In response, the sheriff wrote appellant, stating the doctor's recommendation failed to provide sufficient information to make a decision regarding a full accommodation. As such, Sheriff Doak requested appellant to obtain further information and documentation from Dr. Weiss regarding, inter alia, his impairments, the activities limited by these impairments, as well as medical records from all medical professionals from whom he had sought treatment for the impairments. In the meantime, appellant was ordered to work the power shift.

{¶8} On April 26, 2010, Sheriff Doak sent appellant a letter questioning the relevance of a seven-year-old report relating to a sleep study in which he had previously participated; the letter also noted appellant had questioned the sheriff whether he had to report for work. The sheriff confirmed appellant's status had not changed and he was to complete his road-certification training by May 10, 2010. During his April 27, 2010 shift, Deputy Heath Wilson reported that, while appellant was road training, he stated he could not drive after midnight; appellant advised Deputy Wilson that numerous doctors had explained this to Sheriff Doak, but he has not listened. The report further detailed the problems appellant has with his impairments and noted that, during the training, appellant called Sheriff Doak at home to discuss his doctors' purported

4

recommendations. Deputy Wilson emphasized he was documenting the incident to clarify he had no foreknowledge of appellant's intention to call the sheriff.

{¶9} On April 29, 2010, appellant was notified of a pending disciplinary action submitted by Charging Officer, Major Dale Kelly and Sheriff Doak, for incompetency and insubordination. He was given notice of the pre-disciplinary hearing and that the proposed disciplinary action could result in termination. It is unclear what, if anything, occurred at this hearing. The notice, however, specifically indicated the proposed disciplinary action was appellant's termination.

{¶10} On the same day, an Americans with Disabilities Act ("ADA") questionnaire was sent to appellant's treating physicians. On May 14, 2010, appellant was granted leave under the Family Medical and Leave Act ("FMLA"). On May 20, 2010, appellant provided executed copies of the ADA questionnaire. Meanwhile, Dr. Weiss contacted the Sheriff's Office and, via written recommendation, stated appellant would be unable to return to work until after July 28, 2010 "pending further testing and evaluation."

{¶11} On June 8, 2010, Sheriff Doak sent appellant a letter outlining the details of the reports received by Portage County and the Portage County Sheriff's Office relating to appellant's impairment. The letter noted he had been granted FMLA leave until July 20, 2010 and that the Sheriff's Office would agree to accommodate appellant in the following ways upon his return to active duty: First, the sheriff stated he would keep appellant's position as deputy open until his return, per his physician's order, on July 28, 2010; and when he returns, he will complete his road certification on first shift and upon successful completion, he would be assigned to first shift as a deputy sheriff.

If, however, an emergency requires him to report at any time, day or night, he will be expected to report for duty.

{¶12} On June 14, 2010, Dr. Weiss sent a notification to the Portage County Sheriff's Office stating appellant was cleared to return to work; hence, appellant's FMLA leave ended as of that date. On June 18, 2010, Sheriff Doak sent appellant a memorandum relating to Dr. Weiss' notification. He acknowledged the doctor released him to return to work, but also pointed out appellant's status, effective June 15, 2010, would revert back to administrative leave without pay pending termination, pursuant to the April 29, 2010 disciplinary notice. On June 21, 2010, Sheriff Doak formally notified appellant he was terminated due to the allegations in the April 29, 2010 notice of disciplinary action. Appellant filed a grievance, pursuant to the CBA entered between appellant's union and the Sheriff's Officer (via the Portage County Commissioners).

{¶13} The grievance resulted in arbitration and a hearing was held on July 8, 2011. On January 11, 2012, the arbitrator reached her decision based solely upon the alleged misconduct set forth in the April 29, 2010 notice of disciplinary action. The arbitrator determined, under the terms of the CBA, there was just cause for the termination of appellant for incompetency regarding essential duties that could directly affect the health and safety of the public and appellant's colleagues.

{¶14} In September 2015, appellant filed a complaint against appellees asserting claims of disability discrimination and retaliatory discharge, pursuant to R.C. Chapter 4112. The parties stipulated to the record of the July 2011 arbitration hearing, which included a transcript of the sworn testimony and the exhibits introduced during the proceedings. As such, these items were considered part of the record in the instant

6

matter. Appellees filed a motion for summary judgment, arguing appellant's claims are barred by the doctrine of collateral estoppel and even if not barred, appellant could not establish the elements of his causes of action as a matter of law. The motion was supported by the deposition of Sheriff Doak, the transcript of the July 8, 2011 arbitration proceedings, and the arbitrator's ultimate decision.

{¶15} Appellant filed his memorandum in opposition to appellees' motion and supported the same with his personal affidavit. Appellees subsequently filed a reply to appellant's memorandum. On September 19, 2017, the trial court entered an order granting appellees' motion for summary judgment. The trial court offered no analysis in support of its determination that there were no genuine issues of material fact and, as a result, appellees were entitled to summary judgment. Appellant now appeals and assigns the following as error:

{¶16} "The trial court erred in granting defendants' motion for summary judgment."

{¶17} Summary judgment is a procedural tool that terminates litigation and thus should be entered with caution. *Davis v. Loopco Industries, Inc.,* 66 Ohio St.3d 64, 66 (1993). Summary judgment is proper where (1) there is no genuine issue of material fact remaining to be litigated; (2) the movant is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and, viewing the evidence in the non-moving party's favor, that conclusion favors the movant. *See, e.g.,* Civ.R. 56(C).

{¶18} Because the trial court failed to provide a basis for its conclusion that appellees were entitled to summary judgment, appellant challenges each argument

asserted by appellees in their dispositive motion. Appellant first argues the trial court erred to the extent it awarded appellees summary judgment based upon collateral estoppel. The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. *Norwood v. McDonald*, 142 Ohio St. 299 (1943), paragraph three of the syllabus. Collateral estoppel precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action. *Whitehead v. Gen. Tel. Co.,* (1969), 20 Ohio St.2d 108, 112 (1969).

{¶19} Appellant asserts that, even though the issue of whether he was terminated for just cause was addressed via arbitration, pursuant to the CBA, the arbitrator's ruling did not preclude the underlying statutory discrimination claims. Appellant notes that, even though res judicata has the effect of precluding relitigation of the same cause of action, collateral estoppel precludes relitigation of an issue that has been actually litigated and determined in a prior action. Appellant maintains his statutory causes of action were not "actually and necessarily" litigated in a previous action.

{¶20} Alternatively, appellees argue collateral estoppel bars the underlying claims because the facts and issues animating the claims were determined during arbitration. Appellees claim, under Ohio law, an "arbitration award has the same preclusive effect as a court judgment for the matters it decided." *See e.g. Ford Hull-Mar*

8

*Nursing Home, Inc. v. Marr, Knapp, Crawfis & Assoc., Inc.,* 138 Ohio App.3d 174, 181 (7th Dist.2000). Appellees maintain the issue of whether appellant's termination was the result of discriminatory practices was decided by the 2012 arbitration decision. And, because the arbitrator determined appellant was terminated due to incompetency, the underlying issues are barred by collateral estoppel.

{¶21} Appellant cites *Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974), as his primary authority that collateral estoppel does not bar his statutory claims. *Alexander* involved a grievance-arbitration provision in a CBA and racial discrimination claims under Title VII. The CBA also contained a "no-discrimination" clause. The employee in *Alexander* was terminated and filed a grievance for violation of the CBA alleging racial discrimination. The arbitrator ultimately determined there was just cause for the employee's termination, but did not comment on the claim of racial discrimination. After the arbitration concluded, the employee filed suit in federal district court under Title VII, alleging his discharge resulted from a racially discriminatory employment practice. The employer moved for summary judgment, which the district court granted. The court reasoned the employee was bound by the prior arbitral decision and had no right to sue under Title VII. The circuit court affirmed, and the United States Supreme Court reversed. *Id.* The Supreme Court analyzed the purpose and operation of Title VII and concluded:

{¶22} [T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination. In sum, Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the

9

nondiscrimination clause of a collective-bargaining agreement. *Id.* at 48-49.

{¶23}  The Court also noted the contractual and statutory rights at issue created two separate schemes of remedies.  And because there is a difference between collective and individual rights under the agreement and Title VII, "an employee's rights under Title VII are not susceptible to prospective waiver" in a collective bargaining agreement.  *Id.* at 51-52.  And, the Court emphasized the role of the arbitrator is invariably different from that of a court resolving a discrimination suit:

{¶24}  If an arbitral decision is based 'soley upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced.[ *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)] Thus the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII. *Alexander*, *supra*, at 53-54.

{¶25}   Accordingly, the Court noted that arbitration, per a CBA, does not prevent the Title VII suit because "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII." *Id.* at 59-60.  *Alexander* therefore stands for the general proposition that a CBA-arbitration decision and award does not bar Title VII discrimination claims based on the doctrines of res judicata or collateral estoppel.

{¶26}  Subsequent to *Alexander*, in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, the Court addressed the relationship between an agreement to arbitrate and

10

the federal Age Discrimination in Employment Act ("ADEA"). In *Gilmer*, a securities broker was required by his employer to register as a securities representative with, inter alia, the New York Stock Exchange. The registration application included an agreement to arbitrate any controversy arising out of a registered representative's employment or termination of employment. The employee was terminated at the age of 62 and, rather than seek arbitration, elected to file an ADEA claim in federal district court. The employer filed a motion to compel arbitration, which was denied by the district court based upon *Alexander*. The circuit court reversed the judgment on the basis that the ADEA did not preclude arbitration. The Supreme Court affirmed the circuit court, distinguishing *Alexander*. The Court noted the key distinction between the cases was that the individual employee in *Gilmer* signed an agreement to arbitrate his statutory claims, rather than a union signing a CBA to arbitrate contractual claims. *Id.* at 35. Hence, the employee was precluded from filing suit on the statutory claims. *Id.*

{¶27} In *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1998), the Supreme Court again addressed arbitration under a CBA and the ADA. In *Wright*, the CBA included a grievance-arbitration provision. When the employee was not permitted to return to work after an injury, he filed suit under the ADA, rather than filing a grievance. The district court dismissed the employee's suit for failing to pursue the grievance procedure. The circuit court affirmed, concluding the CBA arbitration clause encompassed a statutory claim under the ADA and was enforceable. The Supreme Court reversed, concluding that for a "union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination" to be enforceable, it must be "clear and unmistakable" that a specific statutory right was waived. *Id.* at 80.

11

The Court emphasized, "'we will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is "explicitly stated."'" *Id.*, quoting *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708. Thus, *Wright* created an additional exception to *Alexander*; to wit, if a grievance-arbitration clause clearly and unmistakably waives an employee's right to bring suit under federal anti-discrimination schemes (or other statutory schemes), it will be upheld.

{¶28} Several courts in Ohio have addressed the interplay between arbitration pursuant to a CBA and statutory discrimination claims. In *Felger v. Tubetech, Inc.,* 7th Dist. Columbiana No. 2000 CO 23, 2002 WL 417903, an employee injured on the job filed a workers' compensation claim. After she was discharged from her employment, the employee filed a grievance alleging her discharge was due to a pattern of company-sanctioned discrimination and harassment arising from her workers' compensation claim. The arbitrator denied the employee's claims. She subsequently filed a complaint in state court asserting various discrimination and retaliation claims. The trial court granted the employer summary judgment, concluding the employee's claim was barred by the doctrine of collateral estoppel. The court reasoned that "the plaintiff raised those issues in the arbitration and therefore asked for them to be decided by the arbitrator." *Id.*

{¶29} On appeal, the Seventh Appellate District Court reversed. The court noted that in *Alexander,* the statutory claim of racial discrimination and the contractual claim of discharge without just cause involved the same issue, i.e., the reason for the employee's discharge. *Id.* at *7. The court pointed out, however, the United States Supreme Court, in *Alexander*, had held that the employee's contractual right to arbitration and statutory claim "'have legally independent origins and are equally

12

available to the aggrieved employee.'" *Felger.* quoting *Alexander*, at 52. The court observed:

> **{¶30}** "'An arbitrator is confined to interpretation of and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. * * * If an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective bargaining agreement, the arbitrator has authority to resolve only questions of contractual rights * * *.'" *Id.,* quoting *Alexander, supra,* at 54.

**{¶31}** The Seventh District noted that there are strong policy reasons for this distinction:

> **{¶32}** "'Labor arbitrators are authorized under a collective bargaining agreement to resolve contractual claims, not statutory claims. Labor arbitrators have developed a body of expertise in labor law. This is why law presumes the arbitrability of disputes based upon a collective bargaining agreement. This is not, however, the same body of expertise or the same body of law implicated by the civil rights statutes. Nor are the remedies the same.' "*Id.,* quoting *Thomas v. Gen. Elec. Co.*, 131 Ohio App.3d 825, 830 (1st Dist.1999).

**{¶33}** The court concluded, therefore, that collateral estoppel did not preclude the statutory claims. Moreover, the First District, in *Thomas*, stated that the line of cases deriving from *Alexander*, extends to "civil rights claims brought pursuant to R.C. Chapter 4112." *Thomas, supra,* at 830. *See also Truax v. EM Industries*, *Inc.,* 107 Ohio App.3d 210 (1st Dist.1995).

**{¶34}** Notwithstanding the foregoing, appellees cite this court's holding in *Hapgood v. Warren*, 11th Dist. Trumbull No. 95-T-5355, 1996 WL 648929. In *Hapgood*, an employee was discharged for falsification of records and gross neglect of duty after filing workers' compensation claims. The employee filed a grievance claiming, under the CBA, he was terminated without just cause. The matter went to arbitration and the

13

arbitrator found the employee was discharged for just cause. After unsuccessfully pursuing a claim with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission, he filed a complaint in the court of common pleas alleging, inter alia, retaliatory discharge. The trial court granted summary judgment. On appeal, this court observed:

> **{¶35}** "After reviewing the record, we determine that the doctrine of collateral estoppel is applicable to appellant's retaliatory discharge claim. Appellant has also failed to argue exactly how the issues in the instant action are different from those in the previous proceedings. We believe that the issues and facts concerning the falsified workers' compensation are sufficiently intertwined with the issues and facts which would have to be determined under R.C. 4123.90 action to require the application of the doctrine." *Id.* at *4.

**{¶36}** This court determined the issues involved in that particular case were "essentially the same, i.e. the reason for appellant's discharge, even though appellant has attempted to characterize the issue under a different claim and asserting that his discharge was for another reason." *Id.*

**{¶37}** Although *Hapgood* facially supports appellees' position, its facts differ in at least one way. In *Hapgood*, the employee went through, not only arbitration, per his CBA, he also pursued two administrative remedies prior to filing his suit. And the *Hapgood* court, albeit not very clearly, did point out that the doctrine of collateral estoppel applies to administrative proceedings. Appellant, in this matter, did not pursue any post-arbitration administrative remedies. Upon careful examination, however, this point, while providing a factual distinction between *Hapgood* and matter sub judice, may be of no legal import. The line of authority cited by *Hapgood* for applying collateral estoppel to administrative proceedings stands for the following general proposition: "where an administrative proceeding is of a judicial nature and where the parties have

14

had an ample opportunity to litigate the issues involved in the proceeding, the doctrine of collateral estoppel may be used to bar litigation of issues in a second administrative proceeding." *Superior Brand v. Lindley*, 62 Ohio St.2d 133 (1980); *see also Office of Consumers' Counsel v. Public Utilities Commission of Ohio*, 16 Ohio St.3d 9, 10 (1985).

**{¶38}** Neither *Hapgood* nor the matter under consideration involve(d) the application of the doctrine in a *second* administrative proceeding. To the contrary, both *Hapgood* and the instant matter involve(d) the proposed use of the doctrine to preclude litigation of a discrimination claim based upon a prior arbitration proceeding pursuant to a CBA. We find no support for this application and the Court in *Alexander* expressly determined the doctrine could not be utilized to preclude statutory claims. Thus, to the extent *Hapgood* relied upon the employee's post-arbitration administrative proceedings to preclude litigation of his statutory claims, that conclusion was error.

**{¶39}** The reasoning in *Hapgood* is fatally flawed in light of the holdings and policy analyses advanced by the United States Supreme Court in *Alexander* and its progeny. Of course, the issues and facts considered in an arbitration proceeding will inevitably be "intertwined" with those which make up the groundwork for a statutory discrimination claim. Simply because the points in each proceeding are not mutually exclusive, however, does not make the issues jointly exhaustive. As the Court noted in *Alexander*, an arbitrator's role is not to evaluate the facts of an employee's discharge in relation to the requirements of legislation prohibiting discrimination; rather, an arbitrator is empowered to resolve questions of contractual rights and, as a result, questions of retaliation and pretext may be well outside the purview of the issue(s) committed to an arbitrator. This point, unto itself, is sufficient to place a statutory discrimination claim

15

beyond the reach of collateral estoppel.  Given the analytic deficiencies of *Hapgood*, we decline to apply it to the instant matter.[2]

**{¶40}**  In this case, arbitration occurred via the grievance procedure pursuant to the parties' CBA and thus was a function of collective representation. As *Alexander* underscored, there is a tension between collective representation and individual statutory rights, the latter of which cannot be waived or resolved by an arbitrator limited to the interpretation of a CBA.  Furthermore, there is nothing in the record to indicate appellant individually agreed to arbitrate his statutory claims.  *See Gilmer*, *supra*, at 35. As such, the arbitrator of the just-cause determination was not authorized to resolve such claims.  Finally, there was no evidence or argument that the CBA "clearly and unmistakably" waived appellant's statutory-discrimination claims.  *See Wright*, *supra*, at 80.  On these bases, we decline to apply collateral estoppel to appellant's statutory claims.

**{¶41}**  We recognize that certain issues of fact in the underlying discrimination case will be common to those considered by the arbitrator. In her decision, the arbitrator observed, "[t]he ultimate issue * * * is whether the County had just cause to terminate the Grievant for his incompetency."  This narrow issue was presented for resolution pursuant to the parties' CBA and, as a result, cannot operate to waive or bar appellant's individual statutory, civil-rights claims. We therefore conclude, pursuant to *Alexander*

---

2. Even though we conclude *Hapgood* was erroneously decided, a panel of this court cannot overrule the decision of another panel absent an en banc proceeding.  Inconsistent authority within the same district may be resolved by a court convening en banc.  *See McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, ¶16 ("'The principal utility of determinations by the courts of appeals [e]n banc is to enable the court to maintain its integrity as an institution by making it possible for a majority of its judges always to control and thereby to secure uniformity and continuity in its decisions, while enabling the court at the same time to follow the efficient and time-saving procedure of having panels of three judges hear and decide the vast majority of cases as to which no division exists within the court.' " *United States v. American–Foreign Steamship Corp.*, 363 U.S. 685, 689–690 (1960), quoting Maris, Hearing and Rehearing Cases in Banc, 14 F.R.D. 91, 96 (1954)).

and its progeny, appellant's causes of action are not barred by collateral estoppel or res judicata.

{¶42} Next, appellant contends that genuine issues of material fact remain for litigation on his disability discrimination and retaliation claims. To establish a prima facie case for disability discrimination, the party seeking relief must establish: "(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." *Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298 (1996), syllabus.

{¶43} When a party makes a prima facie demonstration of the foregoing, the burden shifts to the employer to show a nondiscriminatory reason for the action. *Id.* at 302. The burden then shifts to the plaintiff to demonstrate the employer's stated reason is a mere pretext for discrimination. Pretext may be demonstrated by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

{¶44} Appellant advanced some evidence that he suffered from an impairment or disability; and appellees do not appear to dispute this issue. Appellant contends Sheriff Doak's notice of termination, sent on April 29, 2010, was an adverse employment action; and, a review of the document demonstrates it was, at least in part, for insubordination as appellant took issue with the sheriff's decision to place him on the 8:00 p.m. to 4:00 a.m. shift, despite his physician's recommendations. As such, there is

a genuine issue of material fact as to whether the adverse employment action occurred, in part, because of appellant's impairment. And, appellant asserts, despite his impairment, he could perform the essential functions of the job if reasonable accommodations were made, e.g., allowing him to work first shift.

{¶45} In response, appellees maintain, even if appellant can establish a prima facie case for trial, appellant's termination was based upon his incompetence and deficiencies in performance during his road training, i.e., a reasonable and legitimate nondiscriminatory reason. Appellees point out that appellant had problems with jurisdictional geography during training, and was unable to satisfactorily complete the training. Appellees point to the arbitrator's decision which characterized appellant as unable to navigate and orient himself when operating a motor vehicle to perform his job. Because navigational skills and orientation skills are both essential functions of the job, he was properly terminated for a nondiscriminatory reason. And, with respect to appellant's accommodation argument, appellees underscore that appellant fails to provide any argument that, even if he were permitted to work first or second shift, he could perform the necessary navigational and orientation skills required of a deputy.

{¶46} Appellant maintains, however, genuine issues of material fact remain regarding whether appellees' motivation for terminating him were pretextual. Appellant points to his physician's recommendation restricting him from working third shift. Appellant seems to argue Sheriff Doak's decision to place him on the 8:00 p.m. to 4:00 a.m. "power shift," in spite of the doctor's restriction, is evidence that he was motivated to discriminate against him due to his disability. The record does not support this inference.

18

**{¶47}** Sheriff Doak formally requested more detailed information related to appellant's impairment; he stated "[y]our doctors notice that you cannot work a night shift provides insufficient information on which to make [a] decision as to an appropriate accommodation. Until such time as we receive the further information from your doctor, per the attached form, you will be required to return to full duty with no restrictions. Once we receive further documentation the issues of accommodation, if any is required, will be discussed." The sheriff testified the department's policy regarding shift work is not committed to the discretion of the deputies. Rather, if a deputy wishes to be assigned a different shift, he or she must submit to a bidding process. According to the sheriff, this policy applies universally. Thus, the sheriff's concerns with granting appellant's request, without more documentation with greater details into his impairment, undermine appellant's argument that the sheriff was motivated to discriminate.

**{¶48}** A plaintiff must establish that the alleged legitimate reasons offered by an employer were not its true reasons, but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "But a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." (Emphasis omitted.) *St Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). To carry his burden on summary judgment, appellant was required to produce sufficient evidence from which a jury could reasonably reject the sheriff's explanation for his termination. Appellant's allegation of pretext, in light of the undisputed documentation in the record, is merely speculative. It

is therefore insufficient to create a genuine issue of material fact as to the issue of pretext.

{¶49} Appellant was terminated for incompetency regarding certain essential duties of his job. Although appellant submitted evidence of his impairment, there was no evidence submitted that his sleep disorder caused his deficiencies in navigation and orientation on the road.  Appellant has failed to create a genuine issue of material fact regarding appellees' legitimate nondiscriminatory reason for terminating him.  Because appellant has failed to create a material issue as to the pretext prong, appellees are entitled to judgment as a matter of law on his disability discrimination claim.

{¶50} Appellant next argues the trial court erred in awarding summary judgment to appellees on his retaliation claim.  He maintains there are issues of material fact going to each element of the claim.

{¶51} The Supreme Court explained that in order to establish a prima facie case of retaliatory discharge, the employee must demonstrate: (1) the employee engaged in protected conduct; (2) the employer knew about the protected conduct; (3) the employer took adverse employment action; and (4) a causal connection between the activity and the adverse employment action. *Greer-Burger v. Temesi,* 116 Ohio St.3d 324, 2007-Ohio-6442, ¶13.  If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate reason for its action. *See e.g.  Chandler v. Empire Chemical Inc.,* 99 Ohio App.3d 396, 402 (9th Dist.1994).  And, if the employer meets its burden, the burden shifts back to the employee to establish pretext.  *Id.*

{¶52} Appellant argues he repeatedly requested a reasonable accommodation and supplied medical documentation prior to being issued a notice of termination; he

was terminated in the midst of engaging in the interactive process designed to reach a reasonable accommodation; and the termination occurred subsequent to seeking permission to complete his road training on the first or second shift. Even assuming the foregoing was sufficient to establish a prima facie case for retaliatory discharge, we have previously concluded that appellees advanced a legitimate reason for appellant's termination. We therefore hold appellees were entitled to summary judgment as a matter of law on appellant's retaliatory discharge claim.

{¶53} Appellant's assignment of error lacks merit.

{¶54} For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas is affirmed.


THOMAS R. WRIGHT, P.J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.